UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ABEL A. SAUCEDA,

        Plaintiff,

    v.

                         Case No. 25-cv-1759-pp

HEIDI NEISEN, *et al.*,

        Defendants.

---

**ORDER ADOPTING JUDGE DRIES'S RECOMMENDATION (DKT. NO. 7), DISMISSING ONE DEFENDANT AND DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTIONS TO APPOINT COUNSEL (DKT. NOS. 11, 12)**

---

On November 10, 2025, the plaintiff—who is representing himself—filed a complaint alleging that Kenosha police officers and an assistant district attorney violated his Fourth and Fourteenth Amendment rights. Dkt. No. 1. The case was assigned to Magistrate Judge Stephen C. Dries. Judge Dries reviewed the complaint, granted the plaintiff's motion to proceed without prepaying the filing fee and denied without prejudice the plaintiff's motion to appoint counsel. Dkt. No. 6. Because the court has not yet ordered the defendants to be served with the complaint, they have not appeared in the lawsuit and have not had the opportunity to consent to Judge Dries's authority to decide the case. Coleman v. Labor & Indus. Review Comm. of the State of Wis., 860 F.3d 461, 475 (7th Cir. 2017); 28 U.S.C. §§636(b)(1)(A), 636(c)(1). Judge Dries recommended that this court dismiss one of the fifteen defendants and that the court allow the plaintiff to proceed with the remainder of his

1

claims. Id. at 8. The plaintiff also has filed two motions asking the court to appoint him a lawyer. Dkt. Nos. 11, 12.

This order adopts Judge Dries's recommendation, dismisses one defendant and denies without prejudice the plaintiff's motions to appoint counsel.

## I.   The Plaintiff's Complaint (Dkt. No. 1)

The complaint concerns a traffic stop and subsequent search of the plaintiff and his vehicle by several Kenosha police officers. Dkt. No. 1 at 3. The plaintiff alleges that on May 9, 2024 in the 2700 block of Roosevelt Road in Kenosha, Wisconsin, Kenosha police officers Heidi Neisen and Kyle Toppel pulled over his car while Madelein Prideaux was driving and the plaintiff was in the passenger seat. Id. The plaintiff alleges that there was no traffic violation and that the officers did not have probable cause. Id. He asserts that "Toppel does nothing to intervene to prevent the illegal stop and detention by Niesen." Id. The plaintiff says that Niesen approached the car, says "I thought you were driving Mr. Revoked" and began questioning the plaintiff and Prideaux "about someone else;" he says Niesen asked for identification. Id. The plaintiff says he told Niesen that he'd just come from bond court and that he showed her his papers. Id. He asserts that Toppel approached the passenger-side window "and 'thinks' he 'maybe seen' an open intoxicant on the passenger floor." Id. The plaintiff says that Niesen searched him and that Toppel searched Prideaux. Id. He says that Officer Michael Vences arrived and "st[ood] guard" over the plaintiff and Prideaux while Niesen and Toppel searched the vehicle Id. Niesen

2

found drug paraphernalia in the console; she contacted the Special Investigations Unit by radio to report that fact. Id. Niesen found a gun in a box, which was "in a black duffel bag on the passenger side back seat but not within [the plaintiff's] arms reach," and picked it up "without changing gloves." Id.

The plaintiff alleges that Niesen detained him and handcuffed him, "at which time Prideaux tells Niesen the firearm belongs to her and she put it in there without [the plaintiff's] knowledge." Id. at 4. The plaintiff alleges that Niesen searched him twice more and had Vences "do two groin sweeps" on the plaintiff; the plaintiff says that this was embarrassing, made him fear for his safety and made him fell violated and molested. Id.

The plaintiff next asserts that "SIU" officers Kinzer and Fish arrived, followed by Gerena and Vega; the plaintiff asserts that Vega "is being trained in the SIU." Id. He says that Niesen returned to the firearm and handled it a second time, without changing gloves, "contaminating the evidence further." Id. The plaintiff says that Fish wanted to arrest the plaintiff for the gun "for their 'bigger picture' even though Prideaux has told them multiple times by this point that she takes full accountability for everything in the car because she has been the one using [the plaintiff's] car for the past day." Id. He says that Fish "malic[i]ously begins his narrative by asking 'what can we use to link the gun to him, Im just thinking bigger picture." Id. The plaintiff explains that he was taken to jail; when he arrived, a corrections officer searched him and "threw an xray scanner three times in an attempt to discovery contraband." Id.

3

He says no contraband was found. Id. The plaintiff alleges that "they" strip searched him, put him in jail clothes, put in him a "dry" cell and wouldn't let him use the phone for twenty-four hours. Id. He says he was taken to the hospital, taken back to the jail and strip-searched again. Id. The plaintiff alleges that "Niesen, Toppel, Kinzer, Fish, Gerena, and Vega, bend the truth, plant evidence, with hold evidence (someone else prescription inhaler), and conspire with reckless disregard for the truth to arrest [the plaintiff] to obtain a search warrant for [his] shared residence." Id.

The plaintiff alleges that Vences, Gerena and Vega went to that residence (on 21st Street in Kenosha) and detained Robert Miller, Joshua Sutton and two other people. Id. He says that Kinzer, Fish, Vega, Gerena, Beck, Dorou, Thorpe, Kenesie, Paro and Valerie then executed a search warrant on the residence, as well as on the unattached garage. Id. The plaintiff says that no drug or guns were found, and that he was held for thirty-eight days before his bond was posted on June 28, 2024. Id.

The plaintiff alleges that on November 26, 2024, his lawyer told the district attorney, Emily Gaertner, that there was no probable cause for the stop, the planting of evidence, the withholding of evidence, the contamination of evidence or the reckless disregard for the truth, but he said that Gaertner still wanted to prosecute. Id. at 4-5. He alleges that the chief of police, Patrick Patton, "encourages his officers to find ways to come up with reasonable suspicion at stops even if there is none, violating peoples civil rights." Id. at 5.

The plaintiff adds that none of the officers intervened to prevent the other officers from violating his rights. Id.

The plaintiff seeks compensatory and punitive damages. Id. at 12-13.

**II.     Judge Dries' Recommendations**

Judge Dries recounted a truncated version of these facts in his report. Dkt. No. 7 at 2-3. He found that the plaintiff was suing under 42 U.S.C. §1983, which required the "plaintiff to show that an action taken under the color of law deprived him of his federal constitutional rights." Dkt. No. 7 at 4 (citing Cunningham v. Southlake Ctr. for Mental Health, Inc., 924 F.2d 106, 107 (7th Cir. 1991)). He explained that §1983 personal-capacity suits are appropriate when an official personally deprives a plaintiff of a federal right. Id. (citing Hill v. Shelander, 924 F.2d 1370, 1372 (7th Cir. 1991)). Judge Dries found that, construing his complaint liberally, the plaintiff had alleged sufficient facts "to state claims for false arrest and unreasonable search against this group of officers" and recommended that this Article III court allow the plaintiff to proceed with those claims. Id. at 6–7.

Judge Dries explained that §1983 *official*-capacity suits are appropriate when the officer "is only executing or implementing the official policy or custom of a government entity." Id. at 4–5 (citing Hill, 924 F.2d at 1372). He found that the plaintiff had "alleged that Kenosha police officers were trained to manufacture reasonable suspicion at traffic stops." Id. Judge Dries concluded that the plaintiff had pled sufficient facts to plausibly state a Monell[1] claim,

_____

[1] Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658 (1978)

5

which requires a plaintiff to show "that the constitutional violation was 'caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with final policymaking authority.'" Id. at 4–5 (quoting Stewart v. Wexford Health, 14 F.4th 757 (7th Cir. 2021)). Judge Dries recommended that this Article III court allow the plaintiff to proceed on a Monell claim. Id.

Finally, Judge Dries recommended that this court dismiss Assistant District Attorney Emily Gaertner as a defendant, because "[p]rosecutors have absolute immunity from §1983 for actions taken in their role as an advocate for the state." Id. at 5 (citing Whitlock v. Buggermann, 632 F.3d 567, 582–83 (7th Cir. 2012)).

### III.  Analysis

After reviewing a magistrate judge's report and recommendation, a district court judge may accept, reject or modify, in whole or in part, the findings or recommendations the magistrate judge made in the report. Fed. R. Civ. P. 72(b). If a party objects to any part of the report, the district court must review those parts of the report de novo (in the first instance, without giving deference to the magistrate judge's findings). Id.

Judge Dries advised the plaintiff that if he had any objections the recommendation, he must file them within fourteen days of the service of the recommendation. Id. at 7. That means that if the plaintiff had any objections, he was required to file them by around December 10, 2025. On that date— December 10, 2025—the court received from the plaintiff a letter that stated, "I,

6

Abel A. Sauceda, the plaintiff in this action, does not object, nor appeal, Emily Gaertner from being dismissed from this action." Dkt. No. 7 at 1.

The plaintiff has not objected to any part of Judge Dries's report and recommendation and specifically has explained that he does *not* object to Judge Dries's recommendation that this court dismiss ADA Gaertner as a defendant. The court has reviewed Judge Dries's findings and finds no error in them. The court agrees with Judge Dries' recommendation that it should allow the plaintiff to proceed on a false arrest claim against Neisen, Toppel, Vences, Kinzer, Fish, Vega and Gerena, and on unreasonable search claims against all defendants except Gaertner and Patton. The court will adopt that recommendation.

The plaintiff has sued all the officers and Chief of Kenosha Police Patrick Patton in their official capacities. Dkt. No. at 12–13. He has alleged that Chief Patton encourages officers to violate people's civil rights by finding reasons to stop them even when there are no such reasons. The court agrees with Judge Dries that this very bare-bones assertion is just enough to state a <u>Monell</u> claim, but not against the individual officers. Section 1983 prohibits a "person" acting under color of law from violating another's civil rights. The Supreme Court held in <u>Monell</u>, 436 U.S. at 690, however, that Congress intended municipalities and local governments to be included in the definition of "persons" "where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." It is the *municipality*—here, the City of

7

Kenosha—that is the proper defendant for a <u>Monell</u> claim. And "municipal liability under *Monell* carries an important limitation: the statute does not incorporate the common-law doctrine of respondeat superior, so a municipality cannot be held liable for the constitutional torts of its employees and agents." <u>First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago</u>, 988 F.3d 978, 986 (7th Cir. 2021) (citing <u>Monell</u>, 436 U.S. at 690-91). It is a close call, but the court can read the plaintiff's allegations to assert that the city of Kenosha has a policy that caused a constitutional injury through a person with final policymaking authority—Chief Patton. The court will allow the plaintiff to proceed on a <u>Monell</u> claim against the City of Kenosha and Chief Patton.

Finally, as the plaintiff appears to recognize, Emily Gaertner is immune from suit for all actions taken in her capacity as a prosecutor. <u>See</u>, *e.g.*, <u>Imbler v. Pachtman</u>, 424 U.S. 409, 431 (1976) ("in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under s 1983"). The court will adopt Judge Dries's recommendation and will dismiss Gaertner as a defendant.

## IV.     The Plaintiff's Motions to Appoint Counsel (Dkt. Nos. 11, 12)

Along with his complaint, the plaintiff filed a motion asking Judge Dries to appoint a lawyer to represent him. Dkt. No. 4. The plaintiff advised Judge Dries that he could not afford counsel, that his case was complex, that he had limited access to a law library, that he had limited knowledge of the law and that someone who knew how to read and write had helped him prepare his complaint. <u>Id.</u> at 2. The plaintiff also explained that he'd written to eight

8

lawyers to try to retain one on his own, and he listed them and attached letters from some of them. Id.; Dkt. No. 4-1.

Judge Dries denied the plaintiff's motion. DKt. No. 7 at 6. Although he acknowledged that the plaintiff had tried to find counsel on his own, and that the plaintiff had said he'd had help in preparing the complaint, Judge Dries said that at the pleading stage, he couldn't say that the case was so complex that the plaintiff couldn't handle it himself. Id. Judge Dries said, "[p]ut simply, it's too early to tell whether counsel is needed in this case." Id.

On March 17, 2026, the court received a second motion from the plaintiff. Dkt. No. 11. The plaintiff reiterated that he cannot afford counsel, that his issues are complex, that he'd written to several lawyers with no success, that he had limited knowledge of the law. Id. at 1. He also reiterated the allegations in his complaint. Id. at 1-2. He also raised another set of allegations against defendant Vega, which are not included in the complaint. Id at 3. The plaintiff asserts that he has demanded a jury trial and that he has only a high school diploma. Id. at 1. He says his case will require discovery and depositions. Id. at 3. He asserts that if the court denies his motion, he will be denied the ability to pursue his claims. And he ends by saying that he can't find the "correct paper" to file motions and that he does not know how to type motions on a computer. Id. at 4.

Six days later, on March 23, 2026, the court received yet another motion to appoint counsel from the plaintiff. Dkt. No. 12. The motion itself was the same as the one the court had received on March 17, but the plaintiff attached

9

to this second motion more letters from lawyers and other documents. Dkt. No. 12-1.

In a civil case, the court has the discretion to recruit counsel for individuals unable to afford counsel. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)). In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Pennewell v. Parish, 923 F.3d 486, 490 (7th Cir. 2019), (quoting Pruitt v. Mote, 503 F.3d 647, 653 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Auth., 930 F.3d 869, 871 (7th Cir. 2019). To do so, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

In particular, the lawyers' responses may have bearing on the court's decision to exercise its discretion because they may shed light on whether the

10

plaintiff's attempts to hire counsel were reasonable. Pickett, 930 F.3d at 871. In deciding whether to recruit counsel, the court should consider the reasons the lawyer declined representation, including whether the plaintiff was unwilling (as opposed to unable) to pay a retainer; whether the lawyer lacked time or capacity to take on new clients; or whether the subject matter of the case requires a lawyer who specializes in a specific area of law. Id. The court should also consider how well the plaintiff articulated his case to the prospective lawyer. Id. Where a plaintiff "conveyed his situation well and counsel deemed the claim feeble, then it would be inappropriate for a court to intervene" and recruit counsel. Id. But, where a plaintiff is inarticulate, then a court "may have a useful role to play in recruiting counsel." Id.

When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." Pennewell, 923 F.3d at 490. The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." Id. This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." Id. at 490-491. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." Id. at 491. In situations where the plaintiff files his motion in the early stages of the

11

case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." Pickett, 930 F.3d at 871.

The court agrees with Judge Dries that the plaintiff has demonstrated that he tried to obtain counsel on his own without success. But the court also agrees that it is far too soon for the court to determine whether the plaintiff is one of those rare individuals for whom the court must appoint counsel because he cannot handle the litigation on his own. It is very early in this case. The next step will be for the court to order the U.S. Marshals Service to serve the complaint on the defendants. The defendants then will have the opportunity to answer or otherwise respond to the complaint. If the defendants answer, the court will issue a scheduling order giving the parties dates for exchanging discovery and filing motions. If the defendants respond by filing a motion, the plaintiff will get the opportunity to respond to that motion.

The plaintiff worries that he does not have a "form" for filing motions. There is no "form" that a party must use to file a motion. The person simply needs to do what the plaintiff already has done—write down what he'd like the court to do and explain why. He worries that he does not know how to type motions on the computer. But he doesn't have to type his motions—as long as the court can read the plaintiff's handwriting (which it has had no trouble doing), the plaintiff may hand-write his motions. The plaintiff worries about discovery and depositions. It is too soon to worry about those things—there are a number of steps to get through before the case gets to the discovery stage.

12

The court will deny the plaintiff's motion for appointment of counsel, but it will deny the motion "without prejudice." That means that if things get more complicated over time, to the point where the plaintiff cannot handle the litigation himself, he can renew his motion to appoint counsel.

### III.  Conclusion

The court **ADOPTS** Judge Dries' recommendations. Dkt. No. 7.

The court **ORDERS** that clerk's office must add the City of Kenosha as a defendant for the plaintiff's Monell claim.

The court **ORDERS** that defendant Emily Gaertner is **DISMISSED**.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motions to appoint counsel. Dkt. Nos. 11, 12.

The court **ORDERS** the U.S. Marshals Service to serve a copy of the complaint and this order on defendants Heidi Neisen, Klye Toppel, Michael Vences, Kyle Kinzer, Eric Fish, Javier Vega, Carlos Gerena, Anthony Beck, Nicholas Dorou, Jacob Thorpe, Jason Kenesie, David Paro, Andrew Valerie and Patrick Patton under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff

13

information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** that the defendants must file a responsive pleading to the complaint.

The court **ORDERS** that the parties must not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the Clerk of Court of any change of address. It is the plaintiff's responsibility to notify the court if he changes addresses; if he does not keep the court advised of him address the court may dismiss this case without further notice.

The court is including with this order a copy of a pamphlet called "Answers to Pro Se Litigants' Common Questions." The plaintiff might find it helpful in litigating his case.

Dated in Milwaukee, Wisconsin this 8th day of July, 2026.

BY THE COURT:

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**

14